## EDWARDS *vs.* THE FARMERS' FIRE INSURANCE AND LOAN COMPANY.

Under a clause in an act of incorporation of an insurance and loan company in these words, " that in all cases where the said corporation have become the purchasers of any real estate on which they have made loans, the mortgagors shall have the right of redemption of any such property on payment of the principal, interest and costs, *so long as it remains in the hands of the said corporation unsold;*" IT WAS HELD, that a mortgagor's right of redemption *continued,* notwithstanding that a *contract for the sale* of the mortgaged premises had been entered into and duly executed by the company, one third of the purchase money paid, and possession taken by making surveys, &c.; and that such right of redemption could be extinguished only by the execution and *delivery of a deed* of conveyance to the purchaser, who must be deemed to have contracted with notice of the rights of the mortgagor.

A purchase by an *agent* of the company, of lands on which they had made a loan, *is a purchase by the company,* within the meaning of this act.

A contract for the sale of lands is valid, within the *statute of frauds,* if it be signed by the party to be charged therewith ; it is not necessary to its validity that it should be signed by both parties.

A tender *after the day,* stipulated for the payment of a debt secured by mortgage, is equally effectual to remove the *lien* of the mortgage from the land as a tender *at the day,* provided it be made before foreclosure ; and if the mortgagee be in possession, he may, after the tender, be ousted by the

mortgagor. If the tender be not made until after the day stipulated for payment, the mortgagor is bound to pay such costs as have accrued.

Where premises are *unoccupied*, parties *claiming title* thereto, or some interest therein, may be *named as defendants* in an action of *ejectment;* and they are not permitted to complain that others should have been made defendants instead of themselves, if, when applied to on the subject, they omitted to set the plaintiff right. *It seems*, that sometimes the plaintiff in ejectment has an *election* as to defendants.

This was an action of *ejectment*, tried at the Erie circuit in July, 1837, before the Hon. ADDISON GARDNER, then one of the circuit judges.

The action was brought to recover certain premises which had been *mortgaged* by the plaintiff to the defendants, and which had been bought in by the defendants at a master's sale, in pursuance of a *decree of foreclosure* of such mortgage, and subsequent to which sale the plaintiff had *tendered* to the defendants the full amount of the moneys due upon the mortgage, and the costs of foreclosure : whereby the plaintiff contended, *under the circumstances of the case*, that he had become entitled to be restored to the *possession* of the premises. On the 1st November, 1823, the plaintiff executed to the defendants a mortgage of *nine tracts of land*, situate in the county of Erie, to secure the payment of the sum of $15,000, with the interest thereof, on the 1st January, 1825. On the 12th November, 1832, the defendants filed a bill in chancery for the foreclosure of the mortgage; and on the 29th January, 1833, a decree of foreclosure was made, and the mortgaged premises directed to be sold, the amount due to the defendants having been reported to be $13,652. The mortgaged premises were sold on the *27th August*, 1834, in sundry parcels to various persons, the amount of sales being $12,117 86, leaving a balance due, of principal, interest and costs, amounting to $3514 92. Three of the tracts and portions of two others were bought by *Elisha Tibbets* and struck off to him for the sum of $6910, and deeds were duly executed to the purchasers. On the 25th June, 1835, the defendants made a *statement*, exhibiting a balance of $10,024 67 still due to them, after crediting the above sum of $6910 and the other bids at the sale, together with a pay-

ment made by the plaintiff. On the same day that the above statement was exhibited, the plaintiff *tendered* to the President of The Farmers' Fire Insurance and Loan Company $10,500 in *redemption* of the lands purchased in by *Elisha Tibbits*, and offered to pay forthwith any further sum, if the above was not enough, to satisfy the principal, interest and costs due to the defendants.* He also *tendered* a *conveyance* to be executed by the company releasing and conveying to him the lands purchased by Tibbits at the sale. The president of the company declined to receive the money tendered and to execute the conveyance, *for the reason that the company had made a contract to sell the land.* The money was laid on a table, and when declined to be accepted by the president was taken up by the plaintiff, and has not since been kept as a separate fund.

On the part of the defendants it was shown, that on 17th March, 1835, articles of agreement were entered into between the defendants of the one part, and *William T. Mer-*

---

*The defendants are an *incorporated company*, and were incorporated in 1822. Statutes of 1822, page 47, *et seq.* and amendments to original act, Statutes of same year, page 254. The third section of the act of incorporation is in these words : " *And be it further enacted,* that any such loans on bond and mortgage, or other securities on real estate, shall not be made payable in a shorter time than one year, and the interest payable annually, and the said corporation shall not foreclose any mortgages or securities until after the expiration of five years after the date of such mortgage, provided the interest thereon is punctually paid ; and that, *in all cases where the said corporation have become the purchasers of any real estate on which they have made loans, the mortgagers shall have the right of redemption of any such property on payment of the principal, interest and costs, so long as it remains in the hands of the said corporation unsold;* and the said mortgagor shall also have the the privilege of paying to the said corporation, at any time when the interest shall become due, any part of the principal of such loans. *And it is further declared,* that the said corporation *shall be bound to sell and dispose of any real estate* that may be purchased by virtue of this act, except such as may be necessary for their accommodation in the transaction of their business, *within five ye.rs after it acquired the same,* and shall not be capable of holding the same after the expiration of the said five years, but the same shall immediately after the expiration of the said five years be forfeited to and vested in the people of this state ; *and further,* that all sales under the mortgages, to be taken or holden by the said corporation as aforesaid, shall be made in the county where the said mortgaged property shall be situated."

*ritt* and *Isaac Merritt* of the other part, whereby the defendants, in consideration of $13,000 to be paid to them, covenanted and agreed to grant and convey unto the parties of the second part, the premises purchased by *Elisha Tibbits* at the mortgage sale—the conveyance to be executed within a reasonable time after the *legal title* of the premises should be vested in the company; the whole of the *equitable estate* in the premises being declared to be then vested in the company. The Messrs. Merritt covenanted on their part to pay to the company for the property thus to be conveyed $13,000—one-third thereof on the 1st May, 1835, and the residue in five years, to be secured by bond and mortgage. There was a mutual stipulation that the Messrs. Merritt might take immediate possession of the premises and receive the rents, issues and profits thereof to their own use. This instrument was executed thus: "James Tallmadge, Pres. pro tem. L. S. William T. Merritt, for Isaac Merritt. L. S. Wm. T. Merritt. L. S." On the 1st April, 1835, the Messrs. Merritt *paid the first instalment* provided for in the contract. The reason why a conveyance was not immediately executed to the Messrs. Merritt was, that the property had been conveyed by the master who conducted the sale of the mortgaged premises, to *Elisha Tibbits* individually, and he had died in the month of *February* preceding the date of the contract, without having conveyed to the company. At the time of the purchase he was president of the company, acted as its *agent* in the purchase of the property, and the money of the company was appropriated in satisfaction of the bid made by him for the same at the master's sale. In May, 1835, the Messrs. Merritt proceeded to Buffalo to see the property purchased by them; they went on to it and directed it to be divided into lots and a map thereof to be made, which was accordingly done; they also directed a sewer or ditch to be constructed for draining a portion of the land, which was also done; they claimed to be the owners of the property, entered into a contract for the sale of five lots, and offered other portions of the property for sale. The premises were *unenclosed* and unoccupied *lands*, situate at Black Rock, having always

laid open as commons since the first settlement of that part of the state, except a small piece of about two acres, in the possession of a man of the name of *Wolfe*, who had occupied it for a few years. The defendants. procured conveyances to be executed to them of the premises in question by the *executors* and *widow* of Elisha Tibbits, but the Messrs. Merritt not being satisfied with the title thus obtained, on 3d July, 1835, filed a bill in chancery, before the vice chancellor of the first circuit, *to compel a specific performance* of the contract, in which they made the defendants in this cause and the *heirs* and *personal representatives* of Elisha Tibbits defendants; and on the 8th December, 1835, a specific performance was decreed and deeds were directed to be executed by the *heirs at law* of Elisha Tibbits to the Messrs. Merritt, and also by the present defendants, in pursuance of the contract entered into by them with the Messrs. Merritt. In pursuance of this decree, *deeds* were executed by the heirs of Tibbits and by the present defendants to the Messrs. Merritt, dated 16th December, 1835, and the Messrs. Merritt executed a *mortgage* to the defendants to secure the payments of $8600, the balance of the purchase money as specified in the contract of 17th March, 1835. The plaintiff further proved, that on the 5th September, 1835, notice was duly served upon the Messrs. Merritt of the *tender* made by him to the defendants on the 25th June preceding, and of the *demand* made by him for a deed.

Upon the facts as above stated, *the principal questions* in this case arise; but there were several minor points agitated in the course of the trial, necessary to be stated. For the purpose of showing that the defendants in this case *were properly made defendants*, the plaintiff offered in evidence a *deposition* made by *Hugh Maxwell*, Esq. which it has been agreed might be read in evidence subject to exception, to show that the plaintiffs *claimed* title to the premises. The defendants' counsel objected to its being received in evidence for that purpose, but the objection was overruled. The witness stated in the deposition the *answer* made by the president of the company when the plaintiff made the *tender* of the sum of $10,500 and demanded a deed, viz. *that the*

*company had made a contract to sell the land.* After proving *this fact*, the *tender* and reading in evidence the *mortgage*, the plaintiff rested. Whereupon the defendants moved for a *nonsuit*, on the grounds, 1. that they had not been shown to be in possession of the lands claimed, or that they were *unoccupied*, and that the defendants claimed title thereto at the commencement of the suit; 2. that the *tender* was not sufficient; and 3. that the plaintiff, by the production of the mortgage, had shown title in the defendants: which motion was overruled by the circuit judge.

When the defendants offered to read in evidence the *contract* of 17th March, 1835, the plaintiff objected to its being received on the grounds, 1. that no *authority* had been shown from the board of directors to the president pro. tem. to execute the contract; and 2. that no *authority* to *William T. Merritt* had been shown to execute the contract as the attorney of *Isaac Merritt:* which objections were also overruled by the circuit judge.

The evidence being closed, the circuit judge rose to deliver his charge to the jury. Before doing so, the plaintiff disclaimed all right to recover in this action the two acres in the possession of *Wolfe;* whereupon the judge instructed the jury that the purchase by Tibbits was made for the defendants and whilst the property remained in his hands or in the hands of the defendants, the plaintiff under the provisions of the act incorporating the defendants had the right to redeem; that the *tender* made by the plaintiff caused the *legal title* to revert to him, and extinguish *the lien on the land* for the sum due from the plaintiff, and that the defendants must look to the *personal responsibility* of the plaintiff for the balance of their debt; that the sale to the *Merritts* did not defeat the plaintiff's right to redeem—that it was only *a contract to sell*, and not *an actual sale;* that as long as the property had not been *actually conveyed* to the Merritts, the plaintiff's right to redeem could not be affected by the contract, and the subsequent efforts prior to the tender (which were ineffectual) to perfect that sale; that if the defendants could make contracts for the sale of lands purchased in, to be consummated at a future day, it would be in fraud

of the rights of mortgagors secured by the statute under which the defendants acted ; that the tender of the plaintiff was sufficient, and that it was not necessary to keep the money separate from other funds, nor to bring it into court ; and that the action was properly brought *against the defendants :* the acts of the *Merritts* in relation to the land not being sufficient to constitute them possessors; their possession not being such an actual possession or occupation as to make it necessary to have brought the action against them. Whereupon the jury, under the direction of the judge, found a verdict for the *plaintiff.* The defendants, on a *bill of exceptions,* moved for a new trial.

*E. Sandford & G. Wood,* for the defendants, insisted on the following points :

I. The judge erred in permitting the plaintiff to show that the defendants *claimed title* to, or some interest in, the premises in question at or before the commencement of the suit ; there being no proof that the defendants were in possession, or that the premises were unoccupied.

II. The judge erred in refusing to grant the motion for a *nonsuit ;* the grounds of the motion being stated in the bill of exceptions.

III. The charge of the judge was erroneous in stating : 1. That the provisions in the *charter* of the defendants rendered the sale and foreclosure of the mortgaged property a *continuation* of the mortgage, and that the plaintiff consequently had a right to redeem ; 2. That the *tender* was sufficient, and caused the legal title to revert to the plaintiff ; 3. That the sale to the *Merritts* did not defeat the plaintiff's right to redeem ; that as long as the property had not been *actually conveyed* to the Merritts, the plaintiff's right to redeem was not affected by the contract or the subsequent ineffectual efforts to perfect the sale.

IV. That the question of possession of the *Merritts* should have been submitted to the jury, and not decided by the judge.

*Roger M. Sherman,* for the plaintiff, insisted upon the following points :

I. Had there been no sale or foreclosure, a *payment* by the mortgagor, accepted in full by the mortgagees, after forfeiture at law, the mortgagees being in possession and refusing to release the legal title, would have enabled the mortgagor to bring ejectment; for by the *modern* law of England, and of New York, a satisfied mortgage is no bar to an ejectment by the mortgagor, brought either against the mortgagee or a stranger. In support of which position the counsel cited 2 Burr. 969; 5 Peters' U. S. R. 481; 1 Strange 413; Barnardist. Ch. R. 90; Dougl. 632; 1 East, 288; 4 Johns. R. 41; 18 id. 7; id. 110, and Powell on Mort. 170, there cited; 1 Caines' Cas. in Er. 69; 14 Ves. 128; 2 Cowen, 195; 11. Wendell, 537; 1 R. S. 721, § 45, 47. By § 3, of the act of incorporation of the defendants, the *law day is extended.*

II. A *tender*, as well as a *payment*, after forfeiture, will enable the mortgagor to bring ejectment against the mortgagee or a stranger. Bacon's Abr. tit. Tender, F. Littleton, § 338. Co. Litt. 208. 18 Johns. R. 110.

III. The effect of the *tender* was not impaired or varied by the master's sale to Tibbits. By § 3, of the act of incorporation of the defendants, the *law day* is extended, and the right of the mortgagor preserved.

IV. The *covenant to convey* to the *Merritts* did not impair the plaintiff's right to redeem; it was a mere *executory contract.*

V. Payment by the Merritts of *part of the purchase money*, even if followed by possession, adds no strength to their claim, for it is still an executory agreement only and not a sale. It equally lacks the character exacted by the charter. The right of the *Merritts* in equity against the defendants was as perfect *before* the first payment as afterwards. The plaintiff's right to redeem, therefore, by payment or tender, was not varied by any part performance by the Merritts.

VI. The contract with the Merritts was not only executory, but could not be enforced against the defendants, because not duly executed by one of the Merritts.

In support of the *fourth point*, the counsel insisted that the conveyance to the Merritts, long after the tender, pursuant to a decree in chancery, cannot affect the plaintiff's rights, as they had previously vested, and he was *not a party to the bill*. The right to redeem is preserved, after the sale by the master, and purchased by the corporation, " so long as it shall remain in the hands of the *corporation unsold.*'

There was *no sale* to the Merritts, but only *an executory contract to sell*. But it has been said, that this is a sale within the intent of the charter. The equitable maxim, " that what is agreed to be done shall be considered as done," is not intended as literally true ; but means only, that the covenantor, or promissor, shall not be benefitted by his own neglect to fulfill his undertaking. But the contract of the corporation with the Merritts, is not a sale within the maxim, or in any other sense ; for 1. The plaintiff is not a party to the covenants, nor does he hold under the corporation. He is not, therefore, bound by the covenants. He needs but to *disencumber his old title*, not to acquire a *new* one. He owned the land, subject only to the condition, as modified by the master's sale, according to the charter. The tender fulfilled that condition, and left his own estate unembarrassed. He is *in* of his old title. 2. A power conferred by statute to destroy the title of another, must be *strictly pursued* and *fully executed*. The corporation might defeat the title of the mortgagor, only by *a sale*. 3. The contract with the Merritts was not a sale, either within the strict requirements of the charter, or according to any legal, or even equitable sense. A sale operates *in rem*—a covenant *in personam* only. If A. covenants to convey to B., the latter cannot bring ejectment, even after full performance on his part. But he might, if, at law what ought to be done is considered as done, in the sense contended for by the defendants. Even a court of chancery cannot *pass the title*, but only decree in *personam*, unless authorized by statute. 4. A *sale* binds a *subsequent purchaser without notice* ; but a *contract to sell* does not. 5. If a contract to sell was a sale, and " what ought to be considered as

done," chancery would not decree its execution. It would be already executed. 6. At the time of the tender, this could not be considered as a contract executed ; for the time had not arrived when it "*ought to be done.*" The corporation had not been able, by reasonable diligence, to obtain the legal estate of Tibbits. That required a bill in chancery, as some of the heirs were minors. The land cannot be considered as *sold* by the corporation, when they *could not sell it*, and were not bound to, by the terms of the covenant. 7. The covenant vested no superior equity in the Merritts. They did not claim *under the plaintiff*, but *under the corporation;* to whose rights the plaintiff's title was *paramount.* It was prior in time, being coeval with the mortgage. It was superior in right, not only because it was older, but it conferred on the plaintiff the power of destroying at any time, the title of the corporation. The plaintiff was owner for *every beneficial* purpose ; the corporation could claim it for no purpose but *mere security.* The plaintiff had in it *a freehold of inheritance ;* but the corporation held it as a *mere personal* chattel. (See the authorities above cited.) The plaintiff's right was that of saving a forfeiture of his estate by a just fulfilment of the conditions annexed to it ; but the Merritts, with *full knowledge of the pre-existing rights of the plaintiff*, were mere *voluntary* contractors, to buy at *a future day.* The equity of the plaintiff, were the claims of the parties depending in a court of chancery, would be in all respects superior to those of the Merritts. But the charter secured to the plaintiff a right to redeem *at law*, of which nothing short of an *actual* sale could divest him. 8. Under the master's sale, the rights acquired by the corporation by their purchase, were just the same they would have been, had the power of foreclosure by sale been given in a mortgage, as authorized by statute, 2 R. S. 545, 546, and that power been extended to a private sale. In that case, an executory agreement to sell would not have foreclosed the mortgagor ; an actual sale would be necessary. In this case, as in that, the power must be strictly executed. 9. The provision of the 19th section of the charter, that it " shall be construed, in all

courts and places, benignly and favorably to effect the ends and purposes hereby intended and contemplated," strongly sustains the superiority of the plaintiff's claim over that of the Merritts. In the preamble, the *accommodation of borrowers* is declared to be a leading purpose of the act. The provision in the third section, that no loan shall be for a less term than one year, and that no foreclosure shall be had under five years, are to carry out the same object. The preservation of the right of redemption after a sale to the corporation by the master, so long as it shall remain in their hands unsold, is still subservient to the same end—accommodation and indulgence to the borrower. These rights, thus guarded, cannot be destroyed or impaired, but by a most *rigid* and *unfavorable* construction of the provisions by which the right and property of mortgagors are meant to be protected against the encroachments of the company.

Again : whenever a *sale* is mentioned in the statutes of this state, the word is used in its technical sense, which is, " a transfer of title for valuable consideration." Thus, in 1 R. S. 397, § 63, 64, 65, a sale is directed of real estate for payment of taxes. In this statute, wherever the word occurs it is used to signify an *immediate transfer* of title to the purchaser. The sale is not, in any sense, an *executory agreement to sell,* but a conditional sale, which takes effect *in præsenti.* A parol sale, prescribed by statute, is as effectual as if made with the solemnities required by the statute of frauds and perjuries. The condition is annexed by statute, not by any executory agreement. It is, that the person whose estate is sold may *redeem* by payment within the specified period. The word *redeem,* as used in the statute, implies that the *title has passed* by the act of sale ; otherwise there would be nothing *to redeem.* This condition being prescribed in the statute, the transaction is the same, in substance and effect, as if a deed, thus conditional, were delivered at the same time. The delivery of a deed, on default of redemption, as prescribed in § 80, vests no new title, though called a conveyance ; but merely furnishes evidence that the title before transferred has become

*absolute.* This is stated in § 96, in so many words. Speaking of this conveyance it says, "that whenever the comptroller shall discover, *prior* to the conveyance of any lands sold for taxes, that the SALE was, for any cause whatever, invalid and *ineffectual to* GIVE TITLE *to the lands sold,* he shall not convey the lands so improperly sold," &c. but shall cause the purchase money to be refunded. By this provision, if the *sale itself* has not *given title* "*prior* to the conveyance," the purchase money must *always* be refunded. The statute has, therefore, happily *defined* what it means by a *sale,* and in conformity with the general *legal definition.*

The fact that the purchaser has a conditional and not an absolute estate, or that he is not entitled to entry until a future day, does not make the *sale* an *executory* agreement. The purchaser buys the future interest, when the property is struck off on his bid. A present sale of a future interest transfers the title *in præsenti,* and is as much an *act executed* as if the right of enjoyment were immediate. Thus the sale of a reversion, remainder or other *future* interest in real estate, gives *immediate title,* and is not in any sense executory.

In like manner the word sale, in the statute regarding sales by auctioneers, 1 R. S. 527, §. 26, and elsewhere, is used in its legal and proper sense. The sale is made, and the title passes; but the contract on the *part of the purchaser* may not be immediately executed, (although not *executory*) by payment of the money. A tender of the money in time will entitle the purchaser to trover, if the goods are withheld. This is because the sale gave him an immediate title; for no other conveyance from the vendor is necessary to perfect it. So in the case of sales *on execution,* 2 R. S. 293, by the sale the *title is immediately transferred.* The officer selling, § 42, is to give a certificate "stating the time when *such sale* will *become absolute,* and the purchaser be entitled to a conveyance, pursuant to law." The purchaser is not entitled to a conveyance until *after the sale has become absolute.* The conveyance, therefore, as in the case already noticed of the sale of lands for taxes, is not to transfer a title, but merely to clothe with proper documentary evidence, a title previously

sold, subject to certain conditions, but which has, itself, *by the sale, become absolute, before* the conveyance is given. The power given the debtor, in section. 45, &c., to *redeem*, could with no propriety be granted, unless the title *had passed by the sale*, subject to redemption. In section 61, the power given to confirm irregular sales made by order of a court of probate or surrogate, shows that the sales had transferred the title, and the confirmation obviated the irregularity, but gave no new title. The *conveyance* mentioned performed the same office as the case already explained. But in section 66, "*a contract for the purchase of land*" is mentioned as such, and as contradistinguished from a sale or purchase, which shows that the legislature were aware of the distinction, and used language accordingly. The same remarks will apply to the language used in the statutes of other states, whenever the import of the word *sale* is to be gathered from effects given to a sale by the enactment. In common parlance an agreement to sell, where the vendor is to do further acts in order to transfer the title, is never called a sale. Such use of the word would be especially improper and absurd, if applied to an executory agreement to. *acquire the title* of another and transfer it to the promissee. In common parlance, no one would say that A. had sold to B. the land of C.; that the corporation *had sold* to the Merritts the title still in Tibbits. It must be *acquired* before it can be *sold*. Much less can this be admitted, where the statute is to be liberally and benignly construed in favor of the right which it gives to redeem. There are only two modes of construction—that given in civil, and that in criminal cases, and these are well defined. A law is construed benignly and liberally in favor of the accused. The rules are technical and well settled, and they exclude that interpretation of the third section of the charter which deprives the mortgagor of the right reserved to him, by reason of a contract to sell the title of another, on the ground that it was an *actual sale* within the meaning of the provision.

*G. Wood*, in reply. The only important question is whether after the contract with the *Merritts*, the property in ques-

tion can be considered as *still remaining in the hands of the defendants unsold.* According to the popular sense of the terms used in the act, there is no room for doubt, and this statute should receive a construction according to such sense. Dwarris on Statutes, 702. The statute does not require a *conveyance* to be executed; if a *bargain* be made which can be enforced within the statute of frauds, it is all that can be asked. A *conveyance* is not a *sale ;* it is but the evidence of a sale. After the *statute of uses,* land was sold as an article of merchandize by deed of bargain and sale. 3 Cruise, 172. Bargain and Sale, tit. 32, ch. 11, § 1. Whenever the terms of the bargain are reduced to writing, the property is considered as sold. Our legislature in repeated instances, recognize a *sale* as made, although the *conveyance* is subsequently to be executed: 2 R. S. 48, § 61; 110, § 61; 293, § 42, 43, 45; 409, § 63, 64, 65; 1 R. S. 527, § 26, 532. So do the legislatures of New Jersey and Massachusetts, and the British Parliament, 17 Geo. III. ch. 8; 13 Price, 76, 104. A court of equity would deem the contract a sale and enforce it accordingly. Can it be doubted, that had the property been deteriorated intermediate the contract and a conveyance, that it would have been the loss of the purchasers, and not of the vendors. The learned counsel has alluded to a portion of the defendant's charter, in which it is said, that the act of incorporation shall be construed benignly and favorably, to effect the ends and purposes contemplated by the legislature. Be it so; and it is then asked, did the legislature contemplate that this corporation should in selling the property purchased in by them, dispose of it in a manner different from that usually adopted by owners of property in making disposition of the same. The former owner of the property could not in this way be deprived of his right to redeem, if the sale *was fraudulent ;* but if *bona fide,* the property no longer remaining in the hands of the defendants *unsold,* the right of the party to redeem is gone ; the mortgage having been foreclosed in equity and the *common law right* of redemption thus destroyed.

*By the Court,* Cowen, J. Mr. Maxwell's deposition was clearly admissible, as well to show that the company were properly made defendants, as for other purposes of the cause. It proved that the *defendants claimed title* to the premises in question. No doubt was raised that the president had power to speak in reply to the *tender.* The reason assigned by him for refusing to accept the money was, that the defendants had made a contract to sell. This implied a legal right in the company. It was in effect " claiming title or interest," within the terms of 2 R. S. 230, § 4, 2d ed. It is supposed, that in order to give efficacy to such claim, the plaintiff should have first shown that the premises were *unoccupied.* To this there are two answers : A claim is one material item of evidence to establish possession at the common law. *Non constat,* as yet, that the plaintiff might not proceed to show actual occupation by the defendants ; in which case, it would be material to see by their declarations whether they were in as mere workmen, perhaps daily servants under another, or as claiming to own the premises. *Doe ex dem. Stansbury* v. *Arkwright,* 5 Carr. & Payne, 575. The same section, 4 of the statute, speaks of the exercise of acts of ownership, as of itself subjecting the party to an ejectment. Beside, if it were material to show that the premises were vacant, according to the order which seems to be contemplated by this section, the question was but upon the priority of evidence ; and however the requisite preliminary fact might have been wanting at the stage when the objection was raised, it was supplied by the defendants themselves afterwards proving that such of the premises as the verdict finally covered, were in truth *vacant* at the time when the claim was interposed. It is well settled, that an objection, technically correct at the time, may be rendered pointless by testimony afterwards coming from the objector, or, in many cases, even from the party against whom the exception is taken. *Murray* v. *Judah,* 6 Cowen, 484, 490. *Norris* v. *Badger,* id. 449, 455. *Jackson, ex dem. Hills,* v. *Tuttle,* 7 id. 364, and the note to the latter case, p. 365. The judge was therefore right in refusing to nonsuit the plaintiff on the question of possession.

Whether the case was afterwards varied in this respect by the contract with the Merritts, and their acts of ownership, is another question. I will only observe, for the present, that if the defendants were to be viewed previous to the tender, as I think we shall see they must be with regard to the plaintiff, in the light of legal owners, their interposing a claim of interest, *as owners*, qualified with the mere general declaration that they had contracted to convey to another, the premises being at the same time unoccupied, and it not appearing that the plaintiff was apprised of the circumstances afterwards given in evidence, which might have worked a change of possession as between the defendants and the Merritts, the judge was by no means wrong in finally charging the jury that the defendants were properly made parties. The circumstances of the premises being vacant, a claim of title or some interest would of themselves make the defendants proper parties. 2 R. S. 230, § 4, 2d ed. And after admitting themselves to be proper parties within the statute, the defendants shall not be heard to question the acts or declarations, which in all probability led to the service of the declaration upon them, without at least showing that they had before set the plaintiff right in all those particulars which might instruct him as to the propriety of pursuing other parties. *Hall* v. *White*, 3 Carr. & P. 136. I admit that the stipulation with the Merritts to give them possession, and their acts of ownership which followed, would have made them proper parties in ejectment at the suit of these defendants, and might have warranted the plaintiff's election to sue either. See *Cook* v. *Rider*, 16 Pick. 186, and *Cooper* v. *Smith*, 9 Serg. & Rawle, 26. A resort to the Merritts, however, was matter of election. It would not have concluded the defendants, the former legal proprietors, and still claiming to hold that position, unless the Merritts had compelled them by notice to assume their defence. The present action has the advantage of, covering and contesting the whole interest in the land with persons who are in this respect, at least, more properly made parties. On the whole, therefore, I think there is no technical impediment to an examination of the legal title of these parties.

As between the plaintiff and the defendants, the latter clearly became the legal owners of the premises in question by the purchase of their agent, Tibbits, at the master's sale, although he took the conveyance in his own name. However that might, as it did, with the circumstance of Tibbits' death, produce delay and embarrassment in conveying to the company's vendees, the company can never cut off the right of their mortgagors to redeem within the terms of this charter, by putting forward their agent as the nominal purchaser. To allow such a consequence, would place it in their power to defeat at their pleasure the purposes of a very material enactment. No one of the parties concerned ever thought that Tibbits acquired any real interest even in respect to the company, which is taking the strongest view. The latter having consented to his name being put into the deed as grantee, must abide the effect of its working a technically legal estate in their trustee thus chosen. But it does not look well to make a point that they could by such a manœuvre deprive the plaintiff of his chartered and stipulated right to redeem ; at all events, it would be to fix an extremely bad construction on a statute, were we to say that the party against whom it was intended to operate might evade and defraud it by the adoption of a mere formula.

Then what were the plaintiff's rights as declared by this charter ? I answer, that he had a legal statute right to redeem, so long as the property remained in the defendant's hands unsold ; and this notwithstanding the decree of foreclosure. I will put it that the defendants had made a legal and valid stipulation in their mortgage that the plaintiff might so redeem ; for the charter shall be read as a part of their mortgage. What would have been the consequence of actual redemption by payment ? The counsel for the defendants concede that it would nullify a mortgage in all cases, and both the mortgage and decree in this case, thus revesting the legal title in the mortgagor. And see 1 Powell on Mortgages, 109 to 110, Rand's ed. 1828, and the notes there.

But it is strenuously insisted that a tender and refusal shall not ever touch the lien ; and this is put, first, upon the general

law in respect to redemption, which I hardly think should be allowed to affect the case at bar. But suppose it to bear upon the question, what is the effect of a tender and refusal under that law? This is said to depend on the time when the tender is made. If at the precise day expressed in the mortgage for payment, it is agreed that the lien is thus removed, and that the mortgagor may oust the mortgagee by ejectment, if he be in possession. Co. Litt. 205, a. 1 Powell on Mortgages, Rand's ed. 1828, p. 5, 6. But it is added that a tender after the day has no effect, either at law or in equity, unless it be to save the costs of the latter court when the mortgagor comes with his redemption bill. The argument insists that against the tender we should set up the ancient rigor of the law, by confining it to the day stipulated; that for this purpose, the estate has become absolute; and many cases are cited to show that the ancient strictness has not been relaxed as between the mortgagor and mortgagee, or those standing in their place. That the mortgagee is still, independent of our present statute, 2 R. S. 236, § 57, 2d ed. to be considered the absolute owner at law after default of payment, may be admitted. *Jackson, ex dem. Minkler*, v. *Minkler*, 10 Johns. R. 480. *Jackson, ex dem. The People*, v. *Pierce*, id. 414. *Smith* v. *Shuler*, 12 Serg. & Rawle, 240. *Simpson's lessee* v. *Ammons*, 1 Binney, 175. But why is that so? It is but to afford an additional remedy for non-payment of the money. Per Woodworth, J., 18 Johns. R. 114. This is in furtherance of the primary object. It enables the mortgagee, by a short process of law, to take into his own hand, and withhold the security from the waste of a desperate mortgagor. It is a measure of safety which can many times be compassed in no other way; certainly not by the dilatory and expensive course of a bill and injunction in equity, to which, with us, a mortgagee out of possession is now confined. By the statute, 7 Geo. 2, ch. 20, a court of law might discharge an ejectment brought by the mortgagee, on the money due being brought into court; and in one of the first cases moved under this act, Anon., 1 Strange, 413, Denton of counsel, who made the motion, said that the same thing was done often in the common

pleas. The motion was made at Hillary term, 7 Geo. 2 ; and the practice referred to had probably prevailed even before the passing of the act. Indeed that this is so, and that the strict right is maintained by a mere fiction, to coerce payment, would seem to be implied from the well settled notion that a release or payment of the money saves the estate, and bars an action of ejectment as well as debt on the collateral bond. *Richards* v. *Syms*, Barnardist. Ch. Rep. 90. Per Platt, J. in *Jackson, ex dem. Randall*, v. *Davis*, 18 Johns. R. 7, 12. *Runyan* v. *Mersereau*, 11 id. 534. *Jackson, ex dem. Bowers*, v. *Crafts*, 18 id. 110. *Green* v. *Hart*, 1 id. 590, per Spencer, J. *Jackson, ex dem. Norton*, v. *Willard*, 4 id. 42, 43, per Kent, Ch. J. *Peltz* v. *Clarke*, 5 Peters, 481, 483, and see *Jackson, ex dem. Ireland*, v. *Hull*, 10 Johns. R. 481. Incident to the remedy for enforcing payment, the mortgagee shall be so deemed to have the fee, as to avoid junior incumbrances and transfers made by the mortgagor, whether conventional or by operation of law, as well as for the purpose of a conventional foreclosure by a *release* to him of the equity of redemption. The latter has been held to operate by way of merging the mortgagor's equity in the mortgagee's legal estate, so as to cut off, or at least qualify a right of dower in the former. *Van Dyne* v. *Thayre*, 19 Wendell, 162, and the cases there cited.

'That the mortgagee shall be deemed owner for any other purpose, could not be said in this state, at least after the case of *Runyan* v. *Mersereau*, which held that trespass lay by the mortgagor against the mortgagee, for an entry and cutting timber upon the mortgaged premises, though after default of payment. It is not necessary to go into the cases which consider the relation of the mortgagor to others. It is presented in its various aspects by the cases cited and remarks of the counsel and court in *Runyan* v. *Mersereau*, and again by Savage, Ch. J. in *Astor* v. *Hoyt*, 5 Wendell, 615, 616. See also *Wilson* v. *Troup*, 2 Cowen, 230, 231, per Sutherland, J. and the cases there cited by him. Beside, if the mortgagee is the owner, how can the payment or forgiving of the debt, transfer the freehold from him to the mortgagor? Kent, Ch. J. in *Waters* v. *Stewart*,

1 Caines' Cas. in Er. 69 ; and cases before cited. That was the difficulty in *Richardson* v. *Syms*, where the debt was forgiven. It is supposed that what Lord. Hardwicke said in that case, of the rule *at law*, related to a payment at the day. But it was not pretended on the argument here, that the doctrine now stands narrowed to that; and yet if the estate be absolute in the mortgagee, how can payment defeat the title? It cannot operate as a conveyance, even though the parties should agree expressly, that what is now loudly called the legal estate, should pass. If the mortgagee's right be an estate in land, the statute of frauds says it shall not pass without writing. Here must then be something else than a transfer of the legal fee. What is it? Lord. Hardwicke answers in Barnardiston, 93. He says, the right of the mortgagee is not to be considered an estate in land. His words are: " Where a mortgage is made of an estate, that is only considered as a security for money due. The land is the accident attending upon the other; and when the debt is discharged, the interest in the land follows of course. *In law, the interest in the land is thereby defeated,* and in equity a trust arises for the benefit of the mortgagor. In ejectment, where the title is made under a mortgage, if evidence is given that the debt is satisfied, this is considered as defeating the estate in the land which the mortgagee had ;" and, (he adds,) " especially where the mortgage is ancient, the court will presume that the money was paid at the day." He does not say that if it appear to be paid afterwards in fact, this would differ the result; but only puts presumption of payment at the day as an emphatic case, a mode of defeating the title, even within the most strict notion of the law. He proceeds : " No writing is *in these cases* necessary, which shows that *even the law considers the debt as the principal, and the land to be only an accident.*" The payment, then according to Lord Hardwicke, operates by way of defeasance ; and that, too, a payment after the law day ; not because, as was supposed at the bar, the parties come together and agree that it shall have that effect for the sake of divesting the supposed legal fee. That would be evading the statute of frauds. It

would be conveying an estate in fee under another name agreed by the parties. A. cannot by parol sell his farm to B., by the manœuvre of declaring that his title is subject to a defeasance, even though B. should agree to it. No. The title to real property cannot be divested by a mere payment of money, except where the law itself has first raised the right of defeasance. It does so, according to all the modern cases. It overrides the exact law day, and gives the mortgagor the same right to pay at any time after, until foreclosure, as he had at the day, subject to the addition of costs, if an ejectment or a suit in equity be brought before the payment. It must be admitted that, by this doctrine, nearly all the essential characteristics of the ancient mortgage are subverted ; that it indeed ceases to be a mortgage, except for the purposes we have mentioned ; and now, since the revised statutes, even ejectment is denied. The mortgagee can only retain actual possession till payment, per Savage, Ch. J. in *Jackson, ex dem Titus*, v. *Myers*, 11 Wendell, 538, *Van Dyne v. Thayre*, 14 id. 233, provided he has been voluntarily let into possession. *Van Dyne v. Thayre*, 19 Wendell, 162, and the cases there cited. It has ceased to be the *vadium mortuum*, dead pledge or mortgage. Decisions at law as well as in equity, have long viewed it in the light of a mere pledge of property, redeemable at any time previous to a judicial foreclosure. They have proceeded in the spirit of the civil law, which disabled the borrower to contract for the absolute forfeiture of the property pledged, on condition that the money should not be paid at the day, for fear that cruel creditors should take advantage of the necessity of poor debtors. Wood's Civil Law, 184. Browne's Civil Law, 203. The law day is postponed. The clause which fixes it is, in effect, stricken out of the mortgage. The cases in respect to mortgages of personal property were cited to us; *Brown* v. *Bement*, 8 Johns. R. 96 ; *Ackley* v. *Finch*, 7 Cowen, 290 ; *Langdon* v. *Buel*, 9 Wendell, 80 ; *Ferguson* v. *Lee*, id. 258 ; *Patchen* v. *Pierce*, 12 Wendell, 61 ; but they lie under a different rule. I have been unable in going over the cases to avoid the conclusion, *a priori*, that the mortgagor of the real property

has the same right to pay after, as at the law day, subject to the qualifications I have mentioned. He may, therefore, tender the money; and I cannot see why this shall not be followed by the same consequence as if it had been tendered at the express day, viz. the saving of the estate. " In all cases," says Lord Coke, " of a condition for payment of a certain sum in gross, touching lands or tenements, if lawful tender be once refused, he which ought to tender the money is of this quit, and fully discharged forever afterwards." Co. Litt. 208. Litt. § 338. Coke adds, p. 209, b, " If A. (the mortgagor) tender the money to B., (the mortgagee,) and he refuseth it, A. may enter into the land, and the land is freed forever 'of the condition ; but yet the debt remaineth ; and may be recovered by action of debt." That the right of tender and the same consequence of refusal, extend beyond the law day, was expressly held by this court in *Jackson, ex dem. Bowers, v. Crafts,* 18 Johns. R. 110. Such a tender and refusal, were there received as so far equivalent to payment, that they raised the lien, and barred an ejectment. This decision has several times since been recognized as law, at least by Chief Justice Savage. *Astor v. Hoyt,* 5 Wendell, 617. *Jackson, ex dem. Titus, v. Myers,* 11 id. 538. The reason is the same, whether the tender be made at or after the day. It is in both cases, equally the folly of the mortgagee to refuse. See 18 Johns. R. 115, and books there cited.

I certainly might have contented myself with merely citing *Jackson v. Crafts,* as forming the law of this court, had not that decision been questioned by the present chancellor in the late case of *Merritts v. Lambert,* M. S. which was that of a bill drawing this very title in question. The chancellor held that the tender by the present plaintiff did not divest the legal right of the company. He may indeed be correct in his remark, that the books cited by Mr. Justice Woodworth, who delivered the opinion in *Jackson v. Crafts,* would not of themselves warrant the conclusion to which that case came. They relate to raising the lien by a tender *at the day,* taking for granted what, with reference to the learned chancellor, I think must follow from the

almost unbroken current of modern cases, especially in this state, that the law day is not now what it formerly was, but is extended to all time intermediate the date of the mortgage and foreclosure.   He adds that even actual payment after the law day would not relieve the estate at common law, though he admits it will do so now.   He does not enter into the reason for the distinction, and I have sought in vain for any, except that the law day is adjourned ; thus letting in the same force of the tender upon the adjourned day, which formerly could bear only on the point of time stipulated by the parties.   If the injunction *stare decisis* be allowed in its proper force, it appears to me that after the course this court had taken in regard to mortgages terminating in *Runyan* v. *Mersereau*, it was fully authorized, not to say bound, in *Jackson* v. *Crafts*, to assume that the law day stood open until foreclosure.   To have labored the point might have implied weakness in an important practical position, which the legal school in which Mr. Justice Woodworth had been bred, very justly deemed it unsafe to concede.   It could not have been originally wrong, if it be right to say that the mortgagee shall be content with his money. But if otherwise, the wrong would be much greater were it to be overthrown after standing for more than twenty years, and entering as an acknowledged element into the mortgage transactions of a great commercial state.   Ram on Legal Judgment, 4, 5.

Tribunals of other states, we are admonished, hold a distinction between the effect of tender and payment *after the day*.   *Hill* v. *Payson*, 3 Mass. R. 559.   *Maynard* v. *Hunt*, 5 Pick. 243.   Were this so, even upon good reason, the foreign law of mortgages ought cautiously to be received against what has, I think, reached the rank of a postulate in our own jurisprudence.   But the point did not arise in *Hill* v. *Payson ;* and the *obiter dictum* relied on is very latitudinary.   The court said that a tender would not entitle to an ejectment, without distinguishing between a tender at the day or after.   *Maynard* v. *Hunt* is indeed to the point, but founded on a course of reasoning which I think we have seen cannot be sustained.   The case says

that passing the law day vested a legal title in the mortgagee; and yet suggests that payment would divest it, because by accepting the money the debt is discharged, and the mortgagee waives the condition. Clearly, if there was an estate in fee, it could not thus be divested by parol. Calling it payment and waiver does not change the nature of the act, which, without writing, is made to transfer an inheritable freehold, contrary to the statute of frauds. Then the consequence of a tender is said to be different because the debt is not discharged. The reason is clearly too broad. The debt is not discharged even by a tender at the day; yet the lien on the land was extinguished as long ago as Littleton's day, Co. Litt. 209, a. b. § 338, of Litt. & Coke's Commentary; leaving the debt due and recoverable by action against the mortgagor. If, in Massachusetts, the law day be not postponed, as it would seem from their cases, then indeed neither payment nor tender afterwards could avail any thing. In a former case in the same court, Wilde, J. said the mortgagee's estate and right to possession continues until the full and complete performance of the condition or a tender equivalent thereto; thus at least admitting the doctrine cited from Co. Litt. to which he refers. The short reason of the Massachusetts cases is, however, I apprehend, that they have declined to consider the mortgage a chattel interest, and in that have come short of us. There a mortgage cannot be assigned without deed. Mellen, Ch. J., reviews all their cases decided down to 1823, and says expressly they have come short of the New York cases. *Vose* v. *Handy*, 2 Greenl. 333. That case holds, also, that at law it can be assigned only by deed in the state of Maine. It were more consistent in Massachusetts, to maintain with the late Judge Trowbridge of that state, that even payment after the day will not divest the legal fee of the mortgagee. See his opinion, as stated by Story, J., in *Gray* v. *Jenks*, 3 Mason, 523. Indeed, such I take to be the plain amount of *Parsons* v. *Wells*, 17 Mass. R. 419. The theory, then, of Massachusetts and New York is diametrically opposite. There the mortgagee has a freehold, which passes only by deed. Here he has but a chattel interest, defeasible by payment; and which interest is indeed

so clear of the statute of frauds, that a deed expressly grant-
ing all the mortgagee's estate in the land will not carry the
interest in the mortgage. This was held in *Jackson ex dem.
Curtis* v. *Bronson*, 19 Johns. R. 325. Why will it not touch
that interest? The court answer, " the mortgagee has a
mere chattel interest, and the mortgagor is considered the
proprietor of the freehold." A deed of land will not of course
carry a chattel. This decision was in the spirit of *Martin
ex dem. Weston* v. *Mowlin*, decided by the king's bench,
Lord Mansfield being at their head, 2 Burr. 969, 978, 979,
which held that a devise of land would not carry a mortgage
interest, though a bequest of the money would. We thus
come back to the notion of a chattel pledge redeemable at
any time. Lord Mansfield said the estate in the land is the
same thing as the money due upon it, and will pass by a
will not executed according to the statute of frauds. Wilde,
J. repudiates this doctrine in *Parsons* v. *Welles*, alleging
that Lord Mansfield cited no authority, and his remarks seem-
ed difficult to reconcile with established principles or the stat-
ute of frauds. In this state we have always acted fully up
to Lord Mansfield's doctrines, and carried them out in all
their consequences. It was again under this view that we
were pressed with cases decided in respect to mortgages of
personal property, where default at the day carries an abso-
lute title for every purpose, at least in a court of law. Those
cases have been before cited, and among them *Patchin* v.
*Pierce*, wherein several things are pointed out showing that
the law has raised, in regard to chattel mortgages, a different
system, which, for many years, no one has thought of apply-
ing to mortgages of real property. Upon chattels, the courts
of law, however it may be in equity, have let in the hated
*pactum commissorium*, or dead pledge of the civil law;
though Mr. Justice Nelson thought that its character might
be softened in chancery. *Patchin* v. *Pierce*, 12 Wendell,
62, 63.

But whatever be the law of mortgages in general, how
stand these defendants when placed upon the footing of their
charter? It will be perceived I am all along supposing that
they were, at the time of the tender, still the holders of the

premises in question under the purchase of their agent Tib-
bits; a question to be examined by and by. The third sec-
tion declares that, so long as they thus hold, notwithstand-
ing a decree of foreclosure, *the mortgagor shall have the
right of redemption.* The argument of the defendants is,
" True, you have a *right to redeem ;* but that must depend
on our willingness to receive the money. Till that time the
lien continues." It seems to me that the statement of such
an argument would carry its own refutation, even under the
rigorous doctrines of Coke. A right created by statute ad-
verse to the mortgagee, and yet no remedy at law, is as if
statute and law were not identical ! A right to redeem, but
none to tender the money ! A statute fixing the law day,
and yet a tender at that day shall not take away the lien !
Suppose the defendants had stipulated in terms, under a stat-
ute authorizing it, that their debtor might redeem at any time
before they had sold ; that is this case, and the argument
need not be pursued. It were indeed a singular law which
should declare the right of payment in the debtor, but with-
hold the effect of a tender. A statute lacks one essential at-
tribute of a municipal law, when neither by its own provi-
sions, nor the system under which it is enacted, any method
is pointed out for redressing the wrongs which arise from its
infraction.

Lastly, did the premises in question at the time of the
tender remain in the hands of the defendants unsold ? No
point is now made that Mr. Tallmadge was not authorized
to affix the corporate seal of the company to the *contract
with the Merritts ;* though it is still insisted that it wanted
mutuality, inasmuch as no authority was shown in Wm. T.
to execute for Isaac Merritt. But it is now settled that the
company would be bound by this contract though executed
only by themselves. 2 R. S. 69, § 8, 2d ed. *McCrea* v.
*Purmort,* 16 Wendell, 465, and the cases there cited. For-
mal difficulties being out of the way, shall this contract
be deemed a sale of the land within the charter ? The
Merritts took a contract from the company to convey with-
in a reasonable time after they should become vested with
the title. This qualification, doubtless, had reference to the

embarrassed state of the title as between them and Tibbits, who as their agent, and it must be taken by their consent, purchased and took a deed in his own name. We have already noticed the impropriety of allowing such a condition of things to impede the plaintiff's course in making his tender ; while it had a very different consequence in respect to the defendants. It at least put them to pursue an equitable litigation. Having no title, they were very properly guarded in their contract with the Merritts. They would not convey, nor agree to convey absolutely ; but only on condition that they could obtain the *title ;* and they now say that this agreement was an actual sale of the lands. This they must make out in order to cut off the plaintiff's right to recover.

That here was a strict sale, cannot be pretended, within either the legal or common definition of the term. It was a contract *to sell at another day,* on conditions yet to be performed. It is claimed to derive its operation, and we have just seen does operate under the 8th section of the statute of frauds, which relates to contracts respecting real estate. That section, I think, itself draws the distinction, as I believe it will be found to exist in all those cases where it is sought to be announced by a legal accuracy of expression. The words are, " every *contract for the sale of any lands,* &*c.*" shall be void unless in writing, subscribed by the party " *by whom the sale is to be made.*" In short, this contract with the Merritts was for *a sale to be made ;* and that sale was to be made after the company had acquired title. Again, *Bull* v. *Price,* 5 Moore & Payne, 2, maintains the same distinction. The defendant had retained the plaintiff to negotiate *a sale* of his land ; and agreed to give him two pounds *per cent.* on the sum he obtained. A sale was negotiated, and the money ready to be paid ; but a delay arose in consequence of the vendee requiring that an incumbrancer should join in a conveyance. In an action for the two per cent. Tindal, Ch. J. nonsuited the plaintiff. He said he thought the word " sale" must be construed strictly ; a sale consummated and conveyance executed. On motion at the bar, the nonsuit was sustained. It is proper to

observe that considerable stress was, at the bar, laid upon the phrase "on the sum to be obtained," as implying that the money must be actually paid, or at least tendered to and refused by the plaintiff. But the case furnishes Lord Chief Justice Tindal's definition of a sale when taken according to its strict meaning. It is sometimes used to denote the striking down of land at auction, though the time for executing a deed may be suspended, as in case of sheriffs' sales of land subject to redemption, a sale of land under a power contained in a mortgage, or by the comptroller for taxes. These, and I don't know but some other like cases, were mentioned in argument ; but would hardly furnish out a meaning for private transactions in real estate. Johnson, in his dictionary, gives as a secondary meaning of the word, " a public and proclaimed exposition of goods to the market ; *auction.*" The operative words in a deed of bargain and sale, such as would have satisfied the covenant in question, and which is our ordinary method of passing title, are—have granted, bargained, *sold*, &c. and by these presents do grant, bargain, *sell*, &c. 3 Wood's Conv. 42. Long says, a sale is a *transferring of property* from one person to another. He says it is founded on a valuable consideration, by which the party who *disposes* of his *lands or goods* is induced, &c. Long on Sales, 1. In short, a sale passes the property, and is called a contract executed ; it operates *in rem*, conferring a right to take possession or bring ejectment or trover. A contract to sell, such as the one before us, is executory, and operates *in personam* only. Though one has agreed to sell his farm unconditionally, it must still in legal propriety be considered as unsold. The agreement creates but *jus ad rem ;* a sale, to be complete, must carry the *jus in re.* The former is a step towards the act of sale ; the latter is the act itself. Here the *jus in re* all along continued in the company. The Merritts might refuse to accept the deed of sale ; and the chancellor in his discretion might have refused to decree a sale, on the ground that a cloud rested on the company's title.

Something, too, upon this point, it appears to me, may be collected from the context of the section which confers the

right of redemption.   This declares that the company *shall sell and dispose* of land purchased by them within five years after it acquires the same ; and shall not be capable of *holding the same* after that time.   If they do so hold, the land shall become forfeited to the government.   Can there be a doubt that these phrases contemplate complete acts of acquisition, disposition and forfeiture ?   They relate to the whole estate, legal and equitable. · Can it be that the act of parting with but a portion of the estate will satisfy this provision ?   The Merritts, admitting them to have taken possession and enclosed the land, acquired but an estate at will. The company were their landlords, holding the fee, and at least, on the Merritts' refusing to perform by accepting. a deed of bargain and sale and executing a mortgage security, might turn them out of possession by an ejectment.   Is this the kind of disposition which shall work the consequences of cutting off the right of redemption, and avoiding forfeiture ?   When shall the company be said to *acquire* the property in land ?   When the deed of conveyance is delivered.    When do they *cease to hold* by *selling* and *disposing* ? When they have delivered the deed of conveyance.    If they may hold on to a small part of the estate, they may also to a larger.   The construction contended for by the company would enable them to evade both redemption and forfeiture, still retaining *unsold*, the substantial interest in the land.

Is it then permissible to leave the primary, legal and most common meaning. of the word *sale*, and resort to secondary, accidental or constructive meaning ?   I am aware that we are here again brought to encounter the opinion of the learned chancellor in *Merritts v. Lambert*.   He thinks, that after the creation of a right to a future specific performance, the property is no longer to be considered unsold. If this be so, it must depend on the rule peculiar to his court, that what ought to be done shall be taken as done. I admit this is a rule very healthful in overreaching those who buy, or come in under the covenantor, with notice. But it is after all no more than a fiction, and should never be strained to the working of injustice.  The utmost amount of the argument is, that the word *sale* has in chancery a

constructive meaning, comprehending a class of contracts not known to the law ; that, for certain purposes, it considers a contract executed which is not so, and we are required to construe a word used by a statute in the same broad sense ; in short, to adopt the *equitable*, not the *legal* meaning of the word. Aside from objections arising *a priori* to such a test of statute meaning, I think it will be found that all the cases, so far as they have spoken, are against it. I will mention one which seems to be in point. The statute, 1 R. L. of 1813, p. 74, § 4, provided that where A. was seised or possessed of land in trust for B., the land might be sold on execution against B. ; and Chancellor Kent held that the statute did not extend to such constructive trust as a court of equity raises in favor of a covenantee under a contract to sell. His words are, that to warant an execution against such land, "there must be either a real estate, or an interest known or recognized *at law*." *Bogert* v. *Perry*, 1 Johns. Ch. R. 52, 56. Yet, in equity, here was a seisin in trust for the execution debtor. "Equity," says Sugden, "looks upon things agreed to be done, as actually performed; consequently, when *a contract is made for the sale of an estate* equity considers the vendor as a *trustee* for the purchaser." Sugden on Vend. 211, Brookfield ed. 1836. It is remarkable, that here again we have the real nature of the contract in question stated, "a contract *for the sale* of an estate" [at law], which equity, by a process of reasoning, extremely artificial, considers actually consummated —a *sale made.* Is it safe to say the legislature meant the latter ? If asked, would they say so ? It would be hazarding little to answer that nine tenths of the legislature had never heard of the distinction. But if the distinction were to avail, how far shall it be carried ? *In fictione juris semper æquitas existit.* The title of the plaintiff was paramount to that of the Merritts. They could not enforce their contract against the defendants, till the latter had acquired the legal title. Before they did so as between them and the heirs of Tibbits, the tender was made. They had clearly no right to file their bill against the company at the time of the tender ; and even when the proper time

Edwards v. Farmers' Fire Ins. & L. Co.

arrived, what would the chancellor decree? Not that they *had sold*, but that they *should sell* by a deed of *bargain and sale*, to be approved by the master. The very reason of coming to chancery is, that the covenantor refuses to sell according to his contract. If he is there found to have already sold to the complainant, the bill will be dismissed. We are called on to apply the doctrine of fictitious relation, which is never received to overreach intervening rights. At any rate, shall we carry it so far as to say that a covenant by A. *to sell* B.'s farm when A. gets a title, shall be considered *a sale?* I cannot s ee, however, that we are at all called on for secondary, remote or constructive meanings. I am sure the legislature could not have understood itself as sweeping over the whole field of executory and executed contracts, especially when providing indulgences to avoid the forfeiture of the mortgagor's property, and declaring, as they have, that the act shall be construed benignly and favorably to effect its ends and purposes. Would not such a construction rather operate as a snare to mortgagors? If there be a doubt on the question, I think it should be turned against the forfeiture of estates—against the encroachments of mortgagees. I wish not to be understood as speaking censoriously; but such, I think, has been the spirit of our adjudications—such was that of the Roman law.

It would be arrogant to say, after the decision of his honor the chancellor, that I feel no doubt on any of the points raised in this cause. I will say, however, that aside from his decision, I have found no serious difficulty in concluding that the verdict at the circuit must be sustained.

The CHIEF JUSTICE concurred in this conclusion.

Mr. *Justice* BRONSON dissented.

New trial denied.