After the suit was commenced to foreclose the mortgage, Cady, who had become the owner of the land, tendered the amount due, with the costs, which being refused, he set up the tender in his answer, in bar of the further maintenance of the action. The only question in the case is, whether a tender, made after a mortgage is due, by the owner of the lands mortgaged, discharges the lien.
Forty years ago, this question was fully determined by the Supreme Court of this State, in the case of Jackson v. Crafts
(18 John., 110). Mr. Justice WOODWORTH, in delivering the opinion of the court, observed: "From the nature of the interest the mortgagee has, there is no necessity of a reconveyance by him to the mortgagor after the mortgage has been paid. When that is done, the mortgagee has no title remaining in him to convey, and consequently, by our laws, on payment of the money, he is not deemed a trustee, holding the legal estate for the benefit of the mortgagor. The only question, then, is, whether tender and refusal are equivalent to *Page 356 
payment." Having thus truly stated the relation between mortgagor and mortgagee, according to the law as it was then and has been ever since well settled in this State, he cited some of the early English authorities, holding that a tender of the money due discharged the land from the lien.
Nearly twenty years after this decision was made, the same question again arose concurrently, or nearly so, both in the Court of Chancery and the Supreme Court. The case in each of those courts originated in the same transaction, which was this: In 1823, one Edwards mortgaged land in Buffalo to the Farmers' Fire Insurance and Loan Company in New York. The company foreclosed that mortgage in Chancery in 1833, and at the sale under the foreclosure, Tibbetts, their president, purchased a portion of the lands for the benefit of the company, so that the company was deemed the real purchaser. In 1835 they entered into a written contract with W.T. and Isaac Merritt, whereby they agreed to sell to them the land so purchased, and the Merritts paid a part of the price agreed on. By a clause in the charter of the company, it was declared that when the corporation became the purchaser of any land mortgaged to them, the mortgagor should have the right of redemption of such lands on payment of principal, interest and costs, so long as the same should remain in the hands of the corporation unsold. After the company made the said contract of sale to the Merritts, Edwards, the mortgagor, claiming that the lands in question still remained in the hands of the company unsold, tendered to them the amount of the mortgage debt with interest and costs, and demanded a release or reconveyance of the premises. The tender and release being refused, he brought ejectment against the company in the Supreme Court. (Edwards v. The Farmers' Fire Insurance and LoanCompany, 21 Wend., 467.) The controversy in Chancery was upon a bill filed by the Merritts to enforce the specific performance of a contract with one Lambert for the exchange of the same lands for other real estate in the city of New York; and the question was, whether they could make title to the said lands in Buffalo. Before filing that bill, the heirs of Tibbetts had conveyed to *Page 357 
the Merritts in pursuance of the contract of the company; but that conveyance was given after the above mentioned tender. (Merritt v. Lambert, 7 Paige, 344.) The question of title in both of these controversies depended on two considerations: First, did the lands remain in the hands of the company unsold, notwithstanding the contract to sell them to the Merritts? Second, if so, then did the tender by the mortgagor discharge the lien of the mortgage? — it being, of course, conceded that, under the said clause in the charter, the right to pay off or redeem the mortgage existed, notwithstanding the foreclosure and purchase by the company. The Chancellor was of opinion that the contract with the Merritts was in effect a sale to them, which cut off all the rights of the mortgagor; in other words, that, by reason of that sale having been made, the saving clause in the charter had no effect. He was also of opinion that if the right to redeem was still left in the mortgagor, a mere tender unaccepted did not discharge the lien.
In giving his views upon the last mentioned question, the Chancellor criticised the opinion of Judge WOODWORTH in Jackson
v. Crafts (supra), for the reason that the English authorities which he referred to related to a tender on the day when the mortgage debt became due. (Bac. Abr., tit. Tender, F.; Co. Lit., 209 b, § 338; 20 Viner, tit. Tender, N., § 4.) On this criticism, I shall make one or two observations. By the ancient common law, a mortgage was a grant of land defeasible on the condition subsequent of paying the money at the exact time specified. (1 Powell on Mortgages, 4.) On failure to perform that condition, the grant was absolute, and neither tender nor payment made afterwards could have the effect to revest the title. The specified time of payment was called the law day, because after default the legal rights of the mortgagor were gone. The estate became vested in the mortgagee absolutely, because the original grant was freed from the condition. "For these reasons," the Chancellor himself remarked, "it is, that the mortgagor, or his assigns, or subsequent incumbrancers upon the mortgaged premises, are driven to a bill to redeem, where the mortgagee refuses to receive what is equitably due *Page 358 
to him. But this could not be necessary," he added, "if a mere tender of the amount due after the mortgage has becomeforfeited would have the legal effect of discharging the mortgaged premises from the lien of the mortgage." It is a self-evident proposition, which the Chancellor need not have undertaken to prove, that when the law was that even payment after the law day would not discharge the mortgage, a mere tender could not have such an effect. He was probably quite correct in saying that the English authorities cited by Judge WOODWORTH referred to tender at the day, because those authorities were of a date when even payment after the day did not divest the estate or interest of the mortgagee. But Judge WOODWORTH and the eminent men who sat with him on the bench of the Supreme Court considered, what the learned Chancellor seems to have failed to notice, the fundamental change which the law of mortgage had undergone long before the decision in Jackson v. Crafts was pronounced. In this State, a mortgage had always been regarded as a mere security or pledge for the debt; and the rule had always been, that payment at any time discharged the lien, so that no reconveyance of the estate was necessary. It seems to me, therefore, that the authorities cited by the Supreme Court, on the effect of tender, were extremely pertinent to the question, because they showed very conclusively that a tender at the law day had the same effect on the mortgage as a payment on that day. Underlying this particular proposition, of course, was the more general doctrine that when a certain effect must be given to a payment, a tender will have a like effect. This was what the Supreme Court undoubtedly meant, and the authorities cited simply showed the application of the principle to the law of mortgage. The principle itself, or its application, was not questioned by the Chancellor; but he did not consider, so far as appears, that the rule had become entirely settled, giving to a payment after the day, and on the day, precisely the same consequences. I think, therefore, with great respect for a jurist so learned and accurate, that he differed from the Supreme Court, and criticised its opinion, without due reflection upon the real ground of the decision. *Page 359 
I turn now to the controversy which arose concurrently in the Supreme Court, and directly presented the question for the second time in that court. (Edwards v. The Farmers' Fire Insuranceand Loan Company, supra.) At the trial, the Circuit Judge had ruled in favor of Edwards, the mortgagor, upon both the points above stated. That is to say, he held that, notwithstanding the contract of sale to the Merritts, the lands in question still remained in the hands of the company unsold, and that the tender after the law day extinguished the lien of the mortgage; the foreclosure itself having no contrary effect, according to the express provision of the charter. The plaintiff had a verdict accordingly. A new trial was moved for in the Supreme Court, and denied, — the opinion of the court being delivered by Mr. Justice COWEN, who examined both these questions, and especially the one now presented to us, at great length and with great ability. In the course of the discussion he also spoke of the provision in the charter as an extension of the law day; but to that consideration I think only small importance should be attached, for the charter only extended the "right of redemption," in other words, the right to pay off the mortgage, leaving the effect of an unaccepted tender to depend, as it did before the foreclosure, upon general principles of law. If the concurrence of Chief Justice NELSON had been placed on this special and narrow ground, undoubtedly he would have so stated. Mr. Justice BRONSON dissented from the conclusion; but whether on the ground that the executory sale to the Merritts had cut off all the rights of the mortgagor, or on the ground that a mere tender does not remove the lien of a mortgage, does not appear.
After a decision so authoritative as that of Jackson v.Crafts, and the lapse of nearly twenty years, there being in the intermediate time at least two distinct recognitions of the doctrine in the Supreme Court (5 Wend., 617; 11 Id., 538), this question might well have been regarded as at rest. It sprang, however, into a new existence under the opinion of the Chancellor; and although the Supreme Court, with a new bench of judges, reaffirmed its position after a most elaborate and *Page 360 
searching examination, the subject was perhaps a suitable one for final adjudication in the tribunal of last resort. The action of ejectment was accordingly carried to the Court for the Correction of Errors, which affirmed the judgment of the Supreme Court. (Farmers' Fire Insurance and Loan Company v. Edwards, 26 Wend., 541.) The cause was most fully argued by some of the ablest gentlemen at the bar, and the decision of the court was pronounced beyond all possibility of cavil on the very point now in controversy. The Chancellor, who was a member of the court, and could and did take part in the decision, was for reversal on two grounds, which he stated: 1. That the written contract to sell the premises to the Merritts was a sale within the meaning of the saving clause in the charter of the company. After that contract was made, and a part of the purchase money paid, he thought the lands no longer remained in the hands of the company unsold, so as to authorize the mortgagor to redeem. 2. On the ground that a tender of the mortgage money after default in payment at the day, could not in any case have the effect to extinguish the lien. With the Chancellor concurred seven of the Senators. Senator VERPLANCK delivered an opinion in favor of affirmance, discussing on the other side the same questions and no others. He made no attempt to sustain the decision on the ground that the law day of the mortgage was extended by the charter, in any sense different from a mere continuation of the right to redeem or pay off the debt after the original default and after the foreclosure and sale. No member of the court, on either side of the general question, so much as mentioned that ground of decision; and most manifestly the right to redeem given by the charter, notwithstanding a foreclosure and purchase by the company, could not have, and was not designed to have, the effect of enlarging the contract in respect to the specified time of paying the debt. With Mr. VERPLANCK concurred the President of the Senate and a majority of the Senators. We are bound to say, that the judgment was pronounced on the two propositions discussed in the respective opinions, and it necessarily affirmed both of those propositions. There is no *Page 361 
other conceivable explanation to the judgment, unless we say that a judicial foreclosure and sale created a new law day of indefinite continuance, after the one appointed in the contract had long since passed; and this we cannot say, because such a position was in itself wholly untenable, and was not even alluded to by any member of the court. No one who will read the case with a little attention, can fail to be satisfied that it was a decision most deliberately pronounced upon the very question now to be determined.
Thus far it would seem that no legal proposition was ever more firmly settled by a course of adjudication, than the one which this case presents. It is somewhat extraordinary, therefore, that there is a further history of the question. In Arnot v. Post
(6 Hill, 65), the action was ejectment to recover lands which had been mortgaged by Vial to Winans. The plaintiff's title was under a sale upon a judgment recovered against the mortgagor, soon after the giving of the mortgage. The defendant was in possession, and his title was under a sale upon the foreclosure of the mortgage by advertisement according to the Revised Statutes (2 R.S., 546, § 8), which saved the rights of judgment creditors and of other mortgagees from the effect of such sales. The sale on the judgment took place several years after the foreclosure and sale under the mortgage. Arnot, the plaintiff, was the purchaser, and, claiming that his rights were unaffected by the foreclosure, he tendered the amount due on the mortgage with interest and costs, which being refused, he then brought the ejectment. The questions were these: 1. Whether the foreclosure, according to the true interpretation of the statute, cut off the plaintiff entirely, so that he had no rights either at law or in equity. 2. If not, then whether the judgment creditor could sell on his execution so that the purchaser could, in that manner, acquire the title subject to the mortgage, or whether he must go into equity for relief. 3. These points being in his favor, then the only further inquiry was, whether the tender discharged the mortgage. To entitle him to recover in that action, it was necessary that each of these points should be determined in his favor; and they were so *Page 362 
determined. The opinion was given by Judge BRONSON. Without reexamining the question on the effect of the tender, he very properly said that the law was fully settled in this State by the series of adjudications which I have mentioned. The case was carried to the Court of Errors, where the judgment was reversed (Post v. Arnot, 2 Denio, 344); and the material inquiry now is, whether that decision reversed the rule on the point now under consideration, or unsettled the law which had been so well established. A little attention to the case will show that it did not. The reversal was by a vote of eleven to nine; so that the change of a single vote would have produced a different result. On the argument of the case, the three points above mentioned were urged on behalf of the plaintiff in error. Six of the Senators delivered written or oral opinions in favor of reversal, of whom only two, who did not express their views in writing, placed that conclusion on the single ground that the tender did not discharge the mortgage. The Senator (Mr. PORTER), who delivered the leading opinion in the case, avoided that ground altogether. The other three of the six were for reversal upon that and the other points in the case. The case does not disclose the views of the five members who silently voted for reversal. We have, therefore, no evidence that more than five members of the court out of twenty — the number present and voting — were of opinion that a tender of the money due upon a mortgage, whether made at the time or after it is due, does not extinguish the lien. It is a perfectly just commentary upon the case to say, that it settled no legal proposition whatever, and much less must it be received as unsettling a rule which had become firmly fixed in the jurisprudence of this State.
Such being, as I think, the clear result of the authorities, a renewed discussion of the question may seem to be unnecessary. I cannot help saying, however, that a decision by this court in opposition to the rule laid down in the cases referred to, would introduce into the law of mortgage an inconsistency too plain to escape observation. In the early history of that law, the courts of equity, departing from the letter of the contract, *Page 363 
but adhering to the intention of the parties, adopted the just and liberal doctrine that a mortgage was but a pledge or security, always redeemable until foreclosure. The courts of law followed in the same direction. As Lord REDESDALE observed (Mitf., 428): "The distinction between law and equity is never in any country a permanent distinction. Law and equity are in continual progression, and the former is constantly gaining upon the latter. A great part of what is now strict law was formerly considered as equity, and the equitable decisions of this age will unavoidably be ranked under the strict law of the next." Such, preeminently, has been the course of jurisprudence on this subject. The doctrines originating in the courts of equity, respecting the rights of mortgagor and mortgagee, have been incorporated into the code of the common law, so that there is now no difference between the two systems. This has been true in substance for nearly a century past. In Martin v. Mowlin (2 Burr., 978), decided by the English King's Bench in 1760, it was held that whatever words in a will would carry the money due upon a mortgage would carry the interest in the land. Lord MANSFIELD said: "A mortgage is a charge upon the land, and whatever would give the money would carry the estate in the land along with it. The estate in the land is the same thing as the money due upon it. It will be liable to debts; it will go to the executor; it will pass by a will not made and executed with the solemnities required by the statute of frauds. The assignment of the debt, or forgiving it, will draw the land after it as a consequence; nay, it would do it though the debt were forgiven only by parol." So, in The King v. St. Michaels (Doug., 632), it was said by the same judge, that "a mortgagor in possession gains a settlement, because the mortgagee, notwithstanding the form, has but a chattel, and the mortgage is only a security." To the same effect is The King v. Edington (1 East., 288), and such is the uniform tenor of the English authorities. (See 6 Conn., 159.)
In this State, the rules of law and equity in regard to mortgages have never differed in any degree; it being the doctrine *Page 364 
of both systems that a mortgage is but a personal interest merely. This proposition, in its full length and breadth, was determined in Runyan v. Mersereau (11 Johns., 534), where the question arose in the most direct manner, whether the freehold was in the mortgagor or mortgagee. The plaintiff, deriving title under the mortgagor, sued in trespass for cutting timber; the defendant justifying under a license from the mortgagee. It was held that the action was maintainable; the decision being placed explicitly on the ground that the former was the real owner of the land, while the latter had a chattel interest only. So it has been held in repeated decisions, that the mortgagee cannot, in any way, convey, devise, mortgage or incumber the land, while the mortgagor can do all these things; that judgments against a mortgagee, which are a lien on all legal estates, do not affect his interest in the lands mortgaged; that such an interest does not descend to heirs, but goes to the personal representative as a chose in action; that it is not subject to dower or curtesy; that it passes by a parol transfer, and by any transfer of the debt; and, finally, that it is extinguished by payment, or by whatever extinguishes the debt. (3 Johns. Cas., 329; 1 J.R., 590; 4 Id., 42; 7 Id., 278; 15 Id., 319; 6 Id., 290; 2 Paige, 68, 586; 5 Wend., 603; 2 Barb. Ch., 119.)
But it has been said that the mortgagee could maintain ejectment against the mortgagor, until our Revised Statutes abolished that remedy in such a case, and that even since those statutes, the mortgagee, being in possession, may retain it until the debt is paid. All this is true; but it presents no anomaly or inconsistency in the law. The mortgagee's right to bring ejectment, or, being in possession, to defend himself against an ejectment by the mortgagor, is but a right to recover or to retain the possession of the pledge for the purpose of paying the debt. (6 Conn., 163.) Such a right is but the incident of the debt, and has no relation to a title or estate in the lands. Any contract for the possession of lands, however transient or limited, will carry the right to recover that possession; and such was deemed to be the nature and construction of a mortgage, *Page 365 
it being considered that the parties intended the possession of the thing hypothecated should go with the contract. Ejectment was not, in fact, a real action at the common law. That remedy, in its origin, was only to recover possession according to some temporary right; and it was only by the use of fictions that the title was at length allowed to be brought into controversy. (3 Bl., 199, 200.) When the legislature, by express enactment, denied this remedy to mortgagees, they undoubtedly supposed they had swept away the only remaining vestige of the ancient rule of the common law which regarded a mortgage as a conveyance of the freehold; yet I see nothing inconsistent or anomalous in allowing the possession, once acquired for the purpose of satisfying the mortgage debt, to be retained until that purpose is accomplished. When that purpose is attained, the possessory right instantly ceases, and the title is, as before, in the mortgagor, without a reconveyance. The notion that a mortgagee's possession, whether before or after default, enlarges his estate, or in any respect changes the simple relation of debtor and creditor between him and his mortgagee, rests upon no foundation. We may call it a just and lawful possession, like the possession of any other pledge; but when its object is accomplished, it is neither just nor lawful for an instant longer.
There are terms of the ancient law which have come down to us, having long survived the principles of which they were the appropriate expression. Thus the words "law day" once, and very expressively, marked the time when all legal rights were lost and gone, by the mortgagor's default. There is now no such time until foreclosure by a judicial sentence or sale under a power. But the term is still in use, serving no other purpose than to engender confusion and uncertainty in minds which derive their conceptions from words rather than things. So we have the terms, "redemption" and "equity of redemption," which belonged to a system of law that gave the legal estate, defeasibly before default and absolutely afterwards, to the mortgagee, and which, while that system prevailed, were descriptive of the mortgagor's right to go into equity, on the *Page 366 
condition of paying his debt, to redeem a forfeited estate and demand a reconveyance. These descriptive words yet survive, and are in use, although the ideas they once represented have long since become obsolete. Even the word "forfeiture," still so often used, is no longer, in reference to this subject, the expression of any principle, as it once was. There is now no forfeiture of a mortgaged estate. The mortgagor's rights may be foreclosed by a sentence in the courts, or by a sale had in the manner prescribed by the statute law, if he has himself, in the contract, given authority thus to sell; but, until foreclosure, his estate, the day after a default, is exactly what it was the day before. Controversies like the present would cease to arise, if the mere terms of the law were no longer confounded with its principles.
The proposition, that a tender of the money due on a mortgage, made at any time before a foreclosure, discharges the lien, is the logical result of premises which are admitted to be true. These are, that the mortgagor has the same right after as before a default to pay his debt, and so clear his estate from the incumbrance; and that payment being actually made, the lien thereby becomes extinct. We have, then, only to apply an admitted principle in the law of tender, which is, that tender is equivalent to payment as to all things which are incidental and accessorial to the debt. The creditor, by refusing to accept, does not forfeit his right to the very thing tendered, but he does lose all collateral benefits or securities. (3 Johns. Cas., 243; 12 J.R., 274; 6 Wend., 22; 6 Cow., 728; Coggs v.Bernard, 2 Lord Ray. R., 916.) Thus, after the tender of a money debt, followed by payment into court, interest and costs cannot be recovered. The instantaneous effect is to discharge any collateral lien, as a pledge of goods or the right of distress. It is not denied that the same principle applies to a mortgage, if the tender be made at the very time when the money is due. If the creditor refuses, he justly loses his security. It is impossible to hold otherwise although the tender be made afterwards, unless we also say that the mortgage, which was before a mere security, becomes *Page 367 
a freehold estate by reason of the default. That this is not true, has been sufficiently shown.
It is said that mortgagees will be put to great inconvenience if at any period, however distant from the time of maturity, they must know the amount of the debt and accept a tender on peril of losing their security. The force of this argument is not perceived. As a tender must be unqualified by any conditions, there can never be any good reason for not accepting the sum offered, whether it be offered when it is due or afterwards. By accepting the tender, the creditor loses nothing and incurs no hazard. If the sum be insufficient, the security remains. It is only by refusing, that any inconvenience can possibly arise. But, whatever may be the consequences of refusal, the creditor may justly charge them to his own folly.
The judgment of the Supreme Court must be reversed, and a new trial granted.
SELDEN, CLERKE, WRIGHT, BACON, and DENIO, Js., concurred; the latter putting his concurrence on the ground that the question was so far determined by authority in this State, that it would now be indiscreet to reexamine it in the light of reason and the analogies of the law.